# DAVIS *v.* THE UNITED STATES.

CRIMINAL LAW; THEFT; INDICTMENT; MONEY, DESCRIPTION OF; CONFESSIONS; JURISDICTION; PRESUMPTIONS; CHARGE TO JURY.

1. An indictment in which a count for theft is joined with a count for embezzlement will not be held defective on appeal where the same evidence was relied upon to establish each and the defendant could not, therefore, have been misled or prejudiced in the preparation of his defense; especially where, at the trial, the count for embezzlement was abandoned by the prosecution.

2. An indictment for the theft of money, under section 1158, R. S. D. C., is sufficient in its description of the stolen money, which describes it as " certain securities and obligations of the said United States, current as money, and being in the national currency and money of the said United States, of the value in the aggregate of one thousand dollars, the respective kinds, descriptions, denominations and values whereof the grand jurors aforesaid have no means of ascertaining and, therefore, cannot give, of the goods, chattels and moneys of "— (naming the owner) ; and testimony that there were some fifty-dollar bills among the stolen money, the whole consisting of such currency of the United States as a certain grocery company took in over its counter in the transaction of its ordinary business, is sufficient to support the indictment.

3. The portion of the charge of a trial court in a prosecution for theft, relating to the testimony as to an alleged confession by the accused, and the effect to be given to it by the jury, reviewed and *held* to contain error prejudicial to the accused.

4. *Quære,* whether the courts of this District have jurisdiction of the offense where a theft is committed in a neighboring jurisdiction and the stolen property thereafter brought here.

5. Where, in the prosecution of an express messenger for the theft of a package of money intrusted to him, in Atlanta by his employer, the express company, to be delivered by him in Washington, the

Government made no attempt to prove anything relating to the actions of the defendant on the train between those places, the only testimony upon the subject being that offered by the accused, and nothing was developed from the evidence to show what opportunities the accused had to leave the train temporarily, or whether he in fact did so, and he was not himself interrogated thereon, it was *held* to be error prejudicial to the accused for the trial court to charge the jury, first, that they might infer from all the facts and circumstances, including an alleged confession by the accused, that he feloniously took the package somewhere on the way, and, thereafter, that they might " infer from such facts that he brought it with him into the District, in the absence of proof to the contrary," such a charge authorizing a presumption upon a presumption or an inference from an inference alone, and imposing upon the accused the burden of disproving or overcoming the final inference.

No. 1098.   Submitted June 5, 1901.   Decided June 18, 1901.

HEARING on an appeal by the defendant from a judgment of conviction of theft of the Supreme Court of the District of Columbia; and sentence thereon, upon the verdict of a jury in the trial of an indictment for theft and embezzlement. *Reversed.*

The COURT in its opinion stated the case as follows:

The appellant, George R. Davis, was indicted in the Supreme Court of the District for the theft of $1,000 from the Southern Express Company, has been tried and convicted, and appeals from the judgment and sentence thereon.

The indictment embraces two counts, the first of which charges the offense of theft, and the second, that of embezzlement, there being an allegation that defendant was an employee of the Southern Express Company and as such charged with the possession and safe-keeping of the property. On the trial, the Government abandoned the embezzlement count.

The defendant moved to quash the indictment and, upon the trial, reserved numerous exceptions to the admission of evidence, as well as to the giving and refusal of instructions to the jury. Motions in arrest and for new trial fol-

lowed the verdict of guilty. The leading facts of the case, shown in the bill of exceptions, are these: On July 3, 1899, the Eufaula Grocery Company, at Eufaula, Alabama, delivered a package of currency, amounting to $1,000, to the agent of the Southern Express Company, at that place, for transportation and delivery to the Fourth National Bank of New York city. The treasurer of the grocery company was not able to state whether the currency consisted of national bank notes, silver certificates, gold certificates, or United States treasury notes. All that he could say was, that there were some fifty-dollar bills in the package and the whole consisted of " such currency as the grocery company took in over its counter in the transaction of its ordinary business." He knew that there were no gold or silver coins included and could not remember if there was any legal tender currency. The local agent at Eufaula received and counted the money but could not say that it contained any legal tender notes. He sealed the package in the usual manner, directed it properly and shipped it via Montgomery, Alabama. It was there received at 8 P. M. on July 3d, kept in an iron safe until 5:30 A. M. on July 4th. The Montgomery agent then tied up the package in a bundle containing six or seven other packages and made out the regular way-bills for the same. He then placed the bundle in a cloth pouch and sealed it by running a small wire through eyelet holes at the top, bringing its ends together and fastening them with a soft lead seal which was compressed by use of the regular sealing iron made for the purpose. The messenger, in whose presence this was done, receipted for the bundle, carried it to the express car and locked it in the safe provided for the purpose. Arriving at Atlanta a short time before 12 o'clock, noon, on the same day, he delivered the pouch, with unbroken seal, to the defendant George R. Davis, who receipted for it. Davis was the messenger of the express company, on the express train then about to start, between Atlanta and Washington, D. C. In the car occupied by Davis, the express company had two safes. One was a large, stationary safe with combination and key locks. The messenger carried a key by which he

completed the opening of the safe after the combination lock had been operated. This combination was not within the knowledge of the messenger. In this safe were placed all through packages of money and all those for certain important points between Atlanta and Washington, as Charlotte and Salisbury, N. C., and Danville and Lynchburgh, Va. At Atlanta, as well as at the places named, it was the duty of a local agent, intrusted with the secret of the combination, to enter the car, loose the combination lock and, after the removal and deposit of packages in due course of business, fasten the same. The messenger could not open the combination lock and was not permitted to close it. A small safe is also kept in the car and called the messenger's portable safe. In this are placed packages for delivery at way stations where the large safe cannot be unlocked. The package arrived at Atlanta, while the safe was open, a few minutes before 12 o'clock, which was the hour of departure for Washington. Another connecting train, from Birmingham, was a little late, and Spears, the Atlanta agent for the purpose, closed the combination. He did not testify that he saw the Montgomery pouch placed in the safe, where it belonged, before he closed the combination lock; and does not appear to have been questioned in regard to this very important fact. He was the only person, apparently, except Davis, who was likely to know whether the package had been properly deposited.` The Birmingham train arrived just as the Washington train was pulling out, and the money packages thereon, for carriage to Washington, were delivered to Davis after the large safe had been closed; there was not time to transfer the way-bills.

These additional packages, sixteen in number, were deposited by Davis in the portable safe. The defendant admitted that he received the Montgomery pouch at Atlanta in apparent good order. The train arrived at Washington a little before 7 A. M. on July 5th. A transfer agent of the express company in the regular course of business, immediately boarded the car and threw off the combination of the large safe, and defendant emptied its contents into the porta-

ble safe. This was then locked and carried by wagon to the office at 921 Pennsylvania avenue, and delivered to R. H. Yates, money clerk. Davis accompanied the wagon. Yates testified to receiving the safe about 7 A. M.; that he examined the pouch aforesaid and the seal thereon and discovered nothing wrong about it; that he had the open safe and contents in the room where he was alone for twenty or thirty minutes; that he put everything addressed to New York in a safe which he locked and sealed; that he put the key of this safe in a sealed envelope; that he delivered the safe and the envelope containing its key upon the express car which was due at New York about 4 P. M. the same day. When the safe and envelope were received in New York, the former was found locked and sealed and the envelope had unbroken seals. The agent at New York took out the key, unlocked the safe, took out the Montgomery pouch and emptied the contents upon a shelf. Upon examination, the $1,000 package was not to be found. Another package containing $25,000 had been opened at both ends, but no money was missing. After discovering the loss of the $1,000 package, it was discovered that the seal was not the genuine seal of the express company used at Montgomery. Arthur Baumgarten, a seal-maker, whose place of business was 1005 E street, Washington, and about two blocks distant from the express company's main Washington office, testified that Davis came to his place, on Saturday, June 17, 1899, and ordered a sealing iron with a die containing the words " Sou. Ex. Co. Montgomery "; that he was unknown to him and gave his name as H. B. Smith; that he paid for the seal in advance and gave him a card upon which was written, " H. B. Smith " and " Sou. Ex. Co., Montgomery "; that he made and delivered the sealing iron to defendant on Tuesday, June 20th; that this iron was such an one as could make the impression found upon the lead seal which bound the wires when opened in New York; and the seal as shown him was made by that iron; that he first disclosed the fact to one Leith, a detective, who came to him and made inquiry in August, 1899; that Leith returned with J. B. Hockaday,

assistant superintendent of the express company, when he
told them all that had occurred and gave them the card left
by defendant; that on August 16th he was requested to go
to the express company's office for the purpose of identify-
ing the man for whom he had made the sealing iron; that he
met Leith and Hockaday and soon the defendant came in
and took a seat at a table, whereupon he recognized him
as the man for whom the iron had been made and to whom
he had delivered it; that shortly thereafter witness went into
a small room adjoining the superintendent's office with
Leith and Hockaday; that Hockaday called defendant and
closed the door; that Leith then asked witness if this was
the man for whom he had made the seal; that he said " yes,"
and defendant immediately drew a revolver and began to
shoot at witness. Upon cross-examination, the witness
could not tell how defendant was dressed upon either occa-
sion, or describe his hat or any other article of clothing, or
say whether his hair was long or short; but said he identified
him mainly by the peculiarity of his voice, though he could
not describe what that peculiarity was. He further said
that defendant said he wanted the seal for use by a private
express company, but admitted that he was not certain of
the intended use.    He knew that the express company's office
was near by, but that the order did not excite his suspicion.
Morris Kaufman, another seal-maker, whose place of busi-
ness was on Seventh street, testified, that in June, 1899, the
defendant asked him to make a die for a sealing iron; that
he could not remember what was to be on the die; that he
identified the defendant as the person. He could not de-
scribe the defendant's dress or appearance other than that
he had a short, stubby mustache; nor could he name the
particular day of his call. George E. Leith, an employee
of the Pinkerton detective association, testified to his
efforts along the entire line to discover the criminal; and
to interviewing Baumgarten, and obtaining the card de-
scribed by him; that after defendant's arrest a memo-
randum book was found in his room, in which was written
the name, H. B. Smith, in the handwriting of defendant;

that he arranged the plan to have Baumgarten identify defendant, and was present. He described the identification and the scene following, as Baumgarten had done, and stated that defendant was immediately arrested and taken to the police station. J. B. Hockaday, the assistant superintendent, testified to the efforts made to detect the perpetrator of the theft, and to the information received from Baumgarten; that on account of the resemblance of the writing of the card to that of defendant, he determined to have him come to the office, and be identified by Baumgarten. His account of this is substantially the same as that of others. This witness then further said, that he went to the prison to see defendant, at his request, about 6 o'clock on the same afternoon; that he was there again not later than 9 o'clock; that, as the bill of exceptions recites, " he gave the defendant to understand that he believed he was guilty of taking the money, and asked him where the money was, and he told him that he had only $700 of it left, but did not tell him where the money was; that he could not find out that; that he did not state to the defendant that he was his friend, and that he visited him as a friend." On cross-examination, conducted in the absence of the jury, and with the view to test the competency of his evidence of the confession aforesaid, the witness stated that he had been examined as a witness upon the hearing in the police court and that he did not then testify that, " in the course of the conversation I took occasion to let him understand that I believed he was guilty and the proper course for him to pursue was to make a confession, and said to him, ' Davis, what did you do with the money?' " He expressly denied saying that " the proper course for him to pursue was to make a confession." He denied making more than two visits, and saying on the hearing aforesaid that the last was about 11 o'clock at night.

Upon the recall of the jury, the witness was permitted to testify to the confession made to him as herein first stated above, over an objection of the defendant, founded on the relations of superior and subordinate of witness and defendant, the occurrences of the morning at the office of witness,

and the imprisonment of defendant at the time of the alleged confession. As the admission of this evidence is made the ground of a special exception and assignment of error, the point will be more readily understood, when hereafter discussed, by the addition here of certain rebutting evidence which the bill of exceptions shows was introduced apparently at a later period.

The stenographer and typewriter who took down and wrote out in full the evidence of Hockaday in the police court, recognized the typewritten evidence as that furnished by him, and stated its correctness.

He read therefrom as follows:

" Q. Did he make a confession? A. Not until after he had done the shooting and when I visited him in the jail.

" Q. You visited him? A. He sent for me; requested me to call upon him, which I did. In the course of the conversation I took occasion to let him understand that I believed he was guilty, and the proper course for him to pursue was to make a confession. I said to him, ' Davis, what did you do with the money? ' He replied, ' I have only $700 of it left.'

" Q. Did you go twice? A. Yes; I visited him three times on that day. Twice after Mr. Beall was there.

" Q. How late was the last time you were there? A. About 11 o'clock; no one with me."

The defendant testified in regard to his identification, arrest, and conversations with Hockaday, as follows:

" That on August 16, 1899, he received instructions from some one to report at Mr. Hockaday's office between 9 and 10 o'clock; that he went to his boarding-house in southeast Washington, got his breakfast, and reported, as directed, to Mr. Hockaday; that when he reached the office he saw a man sitting at the far end of the office that he afterwards learned was Mr. Baumgarten, but that he had never seen him before, and did not then know who he was; that he saw Mr. Leith there and Mr. Hockaday, and that after having done some writing, according to the directions of Mr. Hockaday, he observed the three men go into a small hall room in

the south end of the building, and soon afterwards Mr. Hockaday came to the door and called him in, and that he went in, not knowing what they wanted with him; that as he went in Mr. Hockaday closed the door, and that, the three men standing rather near each other and between him and the door, Mr. Leith spoke to him, saying, ' You had a sealing iron made at this man's place,' pointing to Baumgarten, ' on the 17th of June,' and asked Baumgarten if he was the man. Baumgarten nodded his head. Then Mr. Hockaday said, ' Davis, you had as well own up; we have sufficient evidence to know that you are the man that got the money.' Then Leith said, ' I will give you five minutes to fork up the money.' Witness then testified that, being accused of a crime of which he was not guilty and could not have done and did not want to do and was confronted by three men in a little room, he drew his pistol and commenced shooting; that he was immediately arrested and carried to the station; that after being carried to the station he learned that Mr. Hockaday was hurt at him for trying to kill him; that defendant understood that the charge was made that he had attempted to kill Hockaday. Witness testified that he had not attempted to kill Hockaday, and that when he learned Mr. Hockaday was hurt about the matter he sent for him to tell him that he did not intend to kill him; that Mr. Hockaday then told him that he felt a fatherly interest in him; that he was his friend, and that he was willing to do anything for him that he could, and that if witness would *get* up the money that he would see that nothing was done with him; that the matter should not get into the papers, and that his mother and friends should not learn anything about it. Witness stated that he had never been in such a place before; that he was excited, and that in his excitement he remembers that he did say to Mr. Hockaday that he could not raise over $600 or $700; that he believed possibly he might raise something like that, but that he never confessed to having taken any money; that he never intended to confess to taking any money; that he had taken no money from the express company or anybody else.

He says the statement made by Mr. Hockaday that he confessed that he had $700 of the money left is untrue."

The following is the testimony on behalf of the defendant, that is of any importance in the consideration of the assignments of error. He testified first on his own behalf, saying that when in Washington, prior to July 4th, and up to August 16, 1899, he had roomed at 641 South Carolina avenue, S. E., and three other messengers occupied the same room; that he had a common trunk in the room; that he had no recollection when he had last seen the memorandum-book with H. B. Smith written in it; that he wrote the name therein of H. B. Smith, who is a cousin to whom he has been much attached, and with whom he corresponded; that he often spoke of his cousin to his friends and roommates here and in Atlanta; that he did not visit Baumgarten or Kaufman, or order the seal or give Baumgarten the card testified to by him; that he had been a messenger of the express company for three or four years; that a few minutes before 12 o'clock, noon, on July 4th, at Atlanta, Ga., he received the Montgomery pouch from Messenger Farrell in good order and with a perfect seal so far as he knew; that he placed it in the combination safe with other valuables, which was subsequently closed by the Atlanta clerk charged with that duty; that the said safe was not opened any more until reaching Charlotte; that it was there opened by the transfer clerk, Connelley, whereupon the defendant took out the packages for delivery there and gave them to Connelley; that he opened his portable safe and took therefrom the sixteen packages (the same that had been received at Atlanta from the Birmingham agent after the close of the combination safe), which, in Connelley's presence, he put in the combination safe; that Connelley was where he could look into the portable safe (which opened with a lid at top) ; that Connelley did not change his position before he closed the combination lock; that the safe was again opened and closed by the special agents at Salisbury, Danville, and Lynchburg, each of these opening, standing by, and finally closing the same as required; that

the exchange and delivery were made at Washington as testified to by the special clerks there. The testimony of the baggage-master of the train tended to show that express and baggage were carried in one car without a partition — express at one end and baggage at the other; that baggage-master and express messenger both occupied the car en route; that the car had a door at end, through which train-men entered the car often; that defendant had no opportunity to open the large safe unobserved, and it was not opened, except at the points stated by him, and then by agents who could see everything put in or taken out. Defendant also testified that in June, 1899, he had a long brown mustache, and in this was corroborated by a number of witnesses.

Further testimony was then offered by the defendant as recited in the bill of exceptions:

John M. Connelley, a witness for the defendant, testified that on the 4th of July, 1899, he was transfer clerk for the Southern Express Company, at Charlotte, N. C., and that he remembers the arrival of the train on that evening, about 8 o'clock, and that the defendant was the express messenger on the Southern road going from Atlanta to Washington; that he went aboard the express car on the arrival of the train and opened the combination safe and transferred to the defendant what express matter he had going north and received from the defendant what was for Charlotte; that he was present and saw everything that came out of the combination safe and everything that went in the combination safe on that occasion; that he saw the defendant take a number of packages out of his portable safe and place them in the combination safe; that from the position which he occupied he could see in the said portable safe, and that he saw the bottom of the safe and saw Davis take everything out of it, and that there was no bag or pouch in that safe, and that while the portable safe remained open witness closed the door of the combination safe and turned the combination on, thereby locking the safe. Further testimony of the witness tended to establish that the reputation of the defendant for honesty and integrity was good.

The defendant introduced in his behalf all the transfer clerks and baggage-masters who were on the train on which the alleged lost package was brought from Atlanta to Washington, and the testimony of each and every one tended to show that the combination safe on said express car at that time was in good condition, and that the defendant had no opportunities of getting into that safe from the time he left Atlanta, Ga., until after he had reached Washington, except as it would be opened at each transfer station by the transfer clerks.

Witnesses, including Hockaday, testified to the good character and reputation of the defendant, and the Government expressly admitted the same to be true. There was no evidence tending to show how often or long the train stopped between Atlanta and Washington, or whether the defendant left the car, temporarily, at any point, or had an opportunity to do so. The record is silent as to when, where and how he obtained meals on the trip, if any. A genuine impression of the Montgomery seal and that taken from the pouch at New York were exhibited. There were some patent differences between the impressions. The Montgomery seal had the date impressed on the reverse; there was no date on the spurious seal.

[The further material facts will be found stated in the opinion.— REPORTER.]

*Mr. Fred Beall* for the appellant:

1. The indictment in this case seemingly is based upon section 41 of chapter XVI, found on page 164 of the compiled statutes of the District of Columbia. It was, however, contended in the court below, and may be contended here, that the indictment is based upon section 40 of the crimes act. The indictment charges the larceny of " certain securities and obligations of the said United States, current as money and being in the national currency and money of the said United States of the value in the aggregate of one thousand dollars."

Section 41 declares " If any person shall steal  *  *  *  any bank bill, promissory note, or notes, bill of exchange, order, receipt, warrant, draft, check, or bond, given for the payment of money, or receipt acknowledging the receipt of money or other property, or any Government bonds, or *other securities* or stamps, *United States Treasury* notes, or any public stocks of the value of thirty-five dollars or upward, *knowing the same to be such,* any such person shall be deemed guilty of a misdemeanor, and on conviction shall be sentenced to suffer imprisonment and labor not more than three years, nor less than one year."

The language of the indictment points directly to that section. If, however, it is founded on that section it is defective in that it fails to state that the securities alleged to have been taken by the appellant were by him known " to be such." The mere taking of the securities, not " knowing the same to be such " under that section, would be no crime. *Evans* v. *United States,* 153 U. S. 584.

2. The sufficiency of the indictment was attacked by the appellant, both in his motion to quash and in his motion in arrest of judgment, for the reason that the particular place where the alleged crime was committed is not stated in the indictment. It will be noted that the indictment alleges that the offense was committed " at the District aforesaid," referring to the caption of the indictment. It is insisted that the allegation of place is insufficient under the law as declared by the United States Supreme Court, in *Ledbetter* v. *United States,* 170 U. S. 606.

3. If the first count in the indictment is based on section 40 of the crimes act, the offense charged in that count is a felony. But the second count in the indictment under the law is only a misdemeanor, and the two crimes charged are separate and distinct offenses, and could not be joined together in the same indictment.    2 Bishop's New Crim. L., Sec. 327, and subd. 2, and notes, and Sec. 328.    The same act cannot be both a felony and a misdemeanor.    1 Bishop's New Crim. L. 787 and 804, and note; 1 Crim. Proc., Secs. 424, 445, 446.    Since an indictment cannot join a count on

section 40 and a count on section 55 of the crimes act, it is insisted that the only way to sustain the indictment at all is to base the first count of the indictment upon section 41; but, as stated above, it was insisted in the court below that the first count was upon section 40, and if this court shall take the same view of it, it is insisted that the indictment is bad, for a misjoinder of counts. Whether the first count is founded on section 40 or 41 of the crimes act, it is insisted that it is defective by reason of the insufficient description of the property alleged to have been taken. Starkey Crim. Pldg. 218 and 440; 2 Russ. on Crimes, 168; *Stewart's Case,* 4 Serg. & Rawle, 194; *Rex* v. *Craven,* 2 East Crim. L. 601; *Rex* v. *Milnes,* 2 East Crim. L. 602; 2 Bish. New Crim. L., Sec. 374, and notes; 2 Bish. Crim. Proc. 316–323; *Rex* v. *Tyers,* Russ. & Ry. 402; *Britton* v. *State,* 77 Ala. 205; *United States* v. *Barry,* 4 Cranch C. C. 606; *United States* v. *McDaniel,* 4 Cranch C. C. 721; *United States* v. *Curtz,* 4 Cranch C. C. 674.

4. The description of the things in the indictment alleged to have been taken is as follows: " Certain securities and obligations of the United States, current as money and being in the national currency and money of the said United States, of the value in the aggregate of one thousand dollars, the respective kinds, descriptions and denominations and value whereon the grand jurors aforesaid have no means of ascertaining, and, therefore, cannot give." This is an allegation; but whatever was taken, whether it was securities or obligations, it is alleged to have been *in* the national currency and money of the United States; and if it was *in* the national currency and money, then it was necessarily legal-tender money. National currency means the legal-tender money of the United States; but if it did not have that signification when the pleader coupled the expression " national currency " by the copulative conjunction " and " with the word " money," he intended evidently to declare, and the legal effect of the language is to declare, that the securities and obligations taken were money of the United States. If the language employed can receive any other construction, then

31

it is ambiguous and vague and deceptive, and is not such an
allegation as the appellant should have ever been required
to plead to. The proof was that no one knew of what these
securities and obligations consisted, whether of national
bank notes, silver certificates, gold certificates, or any other
obligations. The court seemingly held that, under this in-
dictment, proof showing any kind of obligations or securities
of the United States supported the allegation in the indict-
ment. This is error. If such is the meaning of the lan-
guage of the indictment, then certainly the° appellant was
not informed of the nature and cause of the crime charged
against him. That an indictment charging larceny of money
means legal-tender money (such in the United States as gold
and silver or United States Treasury notes) is so elementary
that it would seem to be unnecessary to cite authorities in
support of that proposition. National currency means the
same as money. *Wharton* v. *Morris,* 1 Dallas, 124; *Block*
v. *Ward,* 27 Mich. 191; *Block* v. *State,* 44 Tex. 620; *Lewis*
v. *State,* 28 Tex. App. 140; 2 Bish. New Crim. Law, Sec.
357; Bish. Stat. Crimes, Secs. 217 and 346; Wharton's
Crim. Pldg. & Pr., Sec. 190; Wharton's Crim. Ev. 1160;
*Wilburn* v. *Greer,* 6 Ark. 255; *Ballard* v. *Wall,* 2 La. Ann.
404; *Hamilton* v. *State,* 60 Ind. 193; *Pryor* v. *Com.,* 2 Dana
(Ky.), 298; *McAuley* v. *State,* 7 Yerg. 526. It is alleged
in the indictment that the grand jury had no means of know-
ing, and, therefore, could not give, the denominations or
value of the bills alleged to have been stolen. The proof
shows that some of the bills were of the denomination of
$50, and this was the testimony of the secretary of the com-
pany that shipped the package. This was a fatal variance.
It was not a fact that the grand jury did not have the means
of finding out and giving the denominations and values of
at least $500 in value of the bills shipped by the consignors,
for the secretary of the Eufaula Grocery Company testified
that he knew some of the bills were $50. The want of de-
scription of the stolen property is only excused as a matter
of necessity. In this case there was no necessity, as shown
by the proof. This was fatal. *Reg.* v. *Stroud,* 2 Moody,

270; 1 Bishop's Crim. Proc., Secs. 493–549, and authorities there cited.

5. There was no proof whatever that the securities alleged to have been taken, or any.part thereof, were ever brought into the District of Columbia. It may be granted for the sake of argument that the defendant took the property alleged to have been stolen, but there isn't a word of proof anywhere as to where it was taken, or where it was carried after it was taken. The presumption is that it was taken in the State of Georgia, and that before it could have been brought into the District of Columbia it would have to have been brought through the several jurisdictions. Mr. Hockaday stated that he never could find out where the money was. The court below told the jury: " If you find that the defendant was on a through express car when he received the pouch, and *if there is no evidence that he was off the car between Atlanta and Washington;* and if you further find from all the evidence, alleged admissions, and circumstances that he in some way obtained possession of said pouch, opened it and took out the package feloniously, while on said run, *you may infer* from such facts that he brought it with him to this District, *in the absence of proof to the contrary."* There is not a single solitary approved authority in America that will sustain that instruction. In the first place, it casts the burden of proof upon the defendant. If the jury under any circumstances could be permitted to draw the inference which the court in that instruction declared that they could, such an inference should have been based upon testimony, and not upon the absence of testimony. In order to have authorized in any view of the case such an inference, it devolved upon the Government to show, that the defendant did receive the pouch upon a through car running from Atlanta to Washington, and that he did not get off of that car from the time he received the pouch until he reached Washington. In the case at bar the court authorizes the jury to return a verdict based upon an inference, itself based upon another inference, and that " in the absence of proof to the contrary." Here we have that which has always been condemned by the law,

namely, a presumption upon a presumption, an inference
from an inference. All the authorities say that venue is a
part of the crime, and all declare that it must be affirmatively
proven. That is, it must be proven just like any other ele-
ment of the crime is proven. *Moore* v. *State,* 55 Miss. 423;
*Briggs* v. *State,* 20 Tex. App. 106; 12 Am. & Eng. Encyc.
of Law, 821, and note. It is said by the Supreme Court of
the United States in *Brewer's Case,* 139 U. S. 278, that,
before a man can be punished, his case must be plainly and
unmistakably within the statute.

6. It is not a crime against the United States to bring
stolen property into the District of Columbia. If the de-
fendant committed the crime charged against him in the
State of Georgia, the offense was against the laws of that
State, and he was subject to indictment and punishment ac-
cording to the laws of Georgia; and if he can be punished
when he brings the property into this District upon the fic-
tion that it is a continuing asportation, then he is liable to be
punished twice under an entirely different system of laws —
to suffer two different punishments — for one and the same
act. If the citations found in Bishop and other elementary
writers to the effect that it is a crime to bring into one juris-
diction property stolen in another are pursued, and the State
decisions examined, in most instances they will be found to
rest upon express statutes. There is no statute in the Dis-
trict of Columbia, and I invite the attention of the court to
the well-considered case of *State* v. *Le Blanch,* 31 N. J. Law
(2 Vroom, 82). See also *Lee* v. *State,* 64 Ga. 203; *Beal* v.
*State,* 15 Ind. 378, and the cases cited in *State* v. *Le Blanch.*

7. It was admitted by the Government that the defendant
was a man of good character for honesty and integrity, and
the proof was conclusive upon this point. At the request
of the appellant the court gave this instruction: " The court
instructs the jury that if they find from the evidence that
the defendant has proven that he was a man of good reputa-
tion for honesty and integrity before the alleged commission
of the offense as charged in the indictment in this case, they
are authorized to take that fact into consideration, and to

give it such weight as they believe it entitled to in connection with all the other facts and circumstances proven in the case." But the court was not content with that familiar and usual statement of the law upon the question of good character, and, therefore, he proceeded to give this instruction to the jury: " Now, on the subject of good character, I will give you *this additional* instruction: ' The good character of the accused is *only* a circumstance to be considered by the jury in connection with all the evidence in the case in determining the question of guilt or innocence. However *good the defendant's character may be, that alone will not entitle him to an acquittal.* The jury can only acquit when a due consideration of all the testimony in the case, including that in regard to the defendant's character, either convinces them that the defendant is innocent, or raises in their minds a reasonable doubt of his guilt."

It will be noted that the court gave this instruction in addition to the one already given, and if in addition, certainly it was then in the mind of the court that it declared some other and further principle than that declared in the one given at the request of the appellant. What is it that is additional? It is this: " However good the defendant's character may be, that alone will not entitle him to an acquittal." That is, in the teeth of the law as declared by the Supreme Court of the United States, and of almost every State in the Union and elsewhere where the common law prevails. In the first place, that instruction is erroneous because of the fact that it is upon the weight of the evidence. It was an invasion of the peculiar province of the jury. They alone had authority to say what weight should be given to good character. The court had no authority to tell the jury what weight they should attach to the good character of the appellant, which was conceded upon the part of the Government, and abundantly proven. The weight of authority in this country is that good character is to be given that weight which the jury feel that it is entitled to, and they are authorized, if the fact of good character is sufficient to generate a doubt in the minds of the jury as to the guilt

or innocence of the defendant, to base their verdict wholly and solely upon the fact that the accused is a man of good character. 5 Am. & Eng. Encyc. of Law, p. 867, and authorities there cited. See also *United States* v. *Gunnell,* 5 Mackey, 196. In the notes to the 5 Am. & Eng. Encyc. of Law are found references to *United States* v. *Jackson,* 29 Fed. Rep. 503, and *United States* v. *Jones,* 31 Fed. Rep. 718, and *United States* v. *Means,* 42 Fed. Rep. 599, and *United States* v. *Newton,* 52 Fed. Rep. 275. The note to each of these decisions is misleading. The decisions in each one of those cases declare the rule as I have stated it above, and practically as stated in 5 Mackey, 196. I may also refer to the cases of *Hannly* v. *Com.,* 116 Pa. St. 322; *Com.* v. *Leonard,* 140 Mass. 473; *While* v. *United States,* 164 U. S. 100.

8. The court instructed the jury upon the question of confessions by reading from the case of *Hardy* v. *United States,* 3 Ct. App. 48. But see *Bram* v. *United States,* 168 U. S. 532, where the doctrine of *Hardy's Case,* upon the subject of confessions, is completely exploded.

*Mr. Ashley M. Gould,* United States Attorney, for the District of Columbia, for the United States, filed no brief.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. Certain of the errors assigned upon the exceptions taken to the action of the court in overruling the motion to quash the indictment may be dismissed with brief mention. Similar objections to an indictment, because the record did not sufficiently show that the court had jurisdiction of the offense, or the proper return of the indictment by a qualified grand jury, and because of want of particularity of the charge in respect of place and the description of the defendant, and so forth, have been fully considered in a recent case and held to be without merit. *Lanckton* v. *United States, ante,* p. 348.

2. There is no necessary inconsistency between the two counts of the indictment, as claimed in the motion to quash,

to render it defective. The first, as we have seen, is for theft, the second for embezzlement of the same property. The two offenses are nearly akin.

The same evidence, without addition or subtraction, is relied on to establish each. The defendant could not be misled or prejudiced in the preparation of his defense.

The second count charging the offense as embezzlement was evidently introduced out of abundant caution. As the express company was but a special owner of the money and as such had delivered it into the actual possession of an employee for the delivery with which it was charged, the pleader was, at the time, apparently, in some doubt whether this special possession of the defendant would, as matter of law, convert the offense of taking and conversion from theft into that of embezzlement. Upon the trial, the embezzlement count was abandoned. This would, of itself, have removed error had there been any.

The motions to quash, and in arrest of judgment were rightly overruled. *Pointer* v. *United States,* 151 U. S. 396, 400.

3. Several assignments of error raise the question of the sufficiency of the description of the stolen property, and variance between the allegation and proof of the same, as presented on the motions to quash the indictment, to direct a verdict for the defendant, and in arrest of judgment. These can with convenience be considered together.

The indictment is founded on section 1158, R. S. D. C., which reads as follows:

" Every person convicted of feloniously stealing, taking, and carrying away any goods or chattels, or other personal property, of the value of thirty-five dollars or upward, or any bank note, promissory note, or any other instrument of writing, for the payment or delivery of money or other valuable thing, to the amount of thirty-five dollars, or upward, shall be sentenced to suffer imprisonment and labor, for the first offense for a period not less than one nor more than three years, and for the second offense for a period not less than three nor more than ten years."

The first count, under which the conviction was had, charges the theft of " certain securities and obligations of the said United States, current as money and being in the national currency and money of the said United States, of the value in the aggregate of one thousand dollars, the respective kinds, descriptions, denominations, and values whereof the grand jurors aforesaid have no means of ascertaining and therefore cannot give, of the goods, chattels and moneys of the Southern Express Company," etc., etc.

(1) The description is not only broad enough to cover what is, technically speaking, the money of the United States, but also their obligations to pay in the shape of gold and silver certificates and national bank notes, which operate as the circulating medium of exchange and perform the ordinary functions of money. As all of this paper, issued by, or under the guaranty of the United States, is everywhere received as the full equivalent of legal-tender money, instances would be rare in which the parties holding or transmitting the same, especially in cases like the present, would be able to describe it with greater certainty than was done in the testimony of the transmitter in this case. He could not state whether the bills delivered to the express company consisted of national bank notes, silver or gold certificates, or treasury notes; but " knew it was such currency of the United States as the Eufaula Grocery Company took in over its counter in the transaction of its ordinary business." The allegation was sufficient to inform the accused fully of the character of proof that would be offered against him, and it is not possible that he could have sustained the slightest injury. To require greater particularity of description by the grand jury, in cases like this, would ordinarily work a failure of justice for which no reasonable excuse can be found.

(2) It is not necessary to determine whether the variance between the proof and the allegation would be fatal if the latter had been confined merely to the " money of the United States," and there is no occasion, therefore, to follow the discussion involving the " legal-tender cases," and the meaning of other statutes relating to money, some of them penal, or reviewing the decisions of State courts.

As we have said before, the description of the indictment is as broad as the statute which applies to all kinds of government securities and obligations which are paid and received as money in the daily transactions of the people. These obligations, technically divisible into gold and silver certificates and national bank notes, as well as the legal-tender treasury notes, constitute what is universally known and understood as " the national currency and money of the United States."

Giving the words of description this popular signification, there was no material variance between allegation and proof; and the court was right in overruling all the objections founded thereon. See 12 Am. & Eng. Encyc. Law, p. 809, and cases cited.

4. The pressure of other important matters as we near the end of the term, and the fact that the judgment must be reversed upon other grounds, prevent the extended statement and consideration of the errors assigned upon exceptions taken to the charge in respect of the evidence of the defendant's good character. It is sufficient to say, that the effect of such proof varies with the facts of particular cases. In some cases it is of no apparent importance, whilst in others it may become a very potent circumstance.

It would be difficult, therefore, if not impracticable, to formulate a charge in respect thereto, applicable to all cases; but one that would seem to answer the purposes of the majority of cases, has been approved by the Supreme Court of the United States in the case of *White* v. *United States,* 164 U. S. 100, 104.

In our opinion, in this, as well as in the matter of instruction upon the operation of the reasonable doubt, the average jury is less apt to be enlightened by refinements in the charge than by a plain and concise statement.

5. The next assignment of error is founded on the admission of the statement of Hockaday of the confession of the defendant, and this, for convenience, will be considered in connection with that founded on the exception taken to the part of the charge commenting thereon. This evidence has

been given in the statement of facts heretofore made. The confession, as given by Hockaday, was admissible because it does not appear therefrom that the defendant was improperly induced to make the same. *Bram* v. *United States,* 168 U. S. 532, 539. Had he admitted, what the report of his former testimony showed, that he had also said to the defendant, " the proper course for him to pursue was to make a confession," the competency of his evidence would admit of some doubt under the doctrine enounced in the case cited above. As he denied making the statement, the question whether he did or not was one for the jury to pass upon under an appropriate charge. The charge referring to the confession was a lengthy one and cannot fairly be condensed with justice to either party. It is reported as follows :

" There is some testimony here of a confession, or admission which amounts practically to a confession, so that I will give you the instruction relative to confessions, so as to enable you to put such weight on that as the circumstances of the case and the words used, if you find they were used, entitle them to have. In that connection, I want to read an extract from the opinion of the Court of Appeals of the District of Columbia in the case of *Hardy* v. *United States,* 3 App. D. C. 35 :

" ' Confessions are not to be excluded because not spontaneous. They would rarely, if ever, be made without the operation of some influence upon the mind of the prisoner. A mere hope, produced chiefly by the prisoner's own imagination or by his conception of the necessities of his situation, or a fear produced by the fact that he has been charged with a serious crime, for the first time in his life, perhaps, arrested and lodged in a close cell, are not sufficient to require the exclusion of confessions made under their several influences. It is only where the confession may be said to have been extorted — that is to say, dragged reluctantly from the breast of the prisoner through the deliberate excitation of his hopes or fears by some actual promise or threat — that the court should refuse to let it go to the jury for any purpose. In all other cases it should be given to the jury as was done

in this instance, with the instruction that it was their duty to reject it altogether if they should have a reasonable doubt as to its voluntary nature.'

" Confessions, of course, are of various kinds. If the defendant, on arraignment here, on having this indictment read to him in open court, should plead guilty, that is all he need to say. That would be a judicial confession that would dispense with the necessity of trial at all — a formal judicial confession of guilt. But if he makes a statement outside of court that amounts to such a confession as that, and it is made voluntarily, without any inducement or any threat or fear held out to him, no matter even if made to some officer having him in charge or made to a disinterested party, it would be competent evidence to be produced before you, and in this case evidence of that character has been introduced.

" A free and voluntary confession is evidence of the highest character, but if made by reason of fear, duress, threat, promise, or hope induced upon the mind of the accused or made by a third person, it is not to be admitted, and, if admitted, the jury are to determine what force it may have where the nature of the force or influence that was exercised does not appear until the testimony is before the jury. If such influence has been brought to bear on the mind of the defendant as to overcome his will and make the confession unworthy of credit, it should not be believed or considered; and if promises or threats were used, if they had no influence, or their influence was totally done away with before the confession was made, the evidence should then be considered.

" The main question in regard to confessions is the same as it is in any other kind of testimony. The main question is, was the confession made under such circumstances that it may be considered true? Is it worthy of belief as a statement of facts? If you believe that the defendant told Hockaday that he had only $700 of the money which was in the $1,000 missing package, you may, if you believe such admission to be the truth, presume from that statement that he had feloniously taken the missing package; and if you fur-

ther believe that he had brought such money, or $35 or more of it, into the District, your verdict should be guilty."

In our opinion, the foregoing charge contains error that was prejudicial to the defendant. It is just to say that the error of the learned justice was, in great measure evidently, superinduced ·by expressions in the opinion, delivered by the present writer for this court, in *Hardy* v. *United States,* 3 App. D. C. 35, 48, some of which were read to the jury as part of the charge.

The decision in that case, in the absence of one in point by the Supreme Court of the United States, was in accord with what we conceived to be the doctrine of the majority of well-considered English and American cases where there had been no legislation affecting the rule. Since then, the Supreme Court has considered the general question, and, after an exhaustive review of the authorities, given expression to views, which, though the facts of the two cases are quite different, conflict with the expressions in the opinion in the *Hardy Case* that form a part of the charge. *Bram* v. *United States,* 168 U. S. 532 542, 549, 550, 555, 560, 565. Some passages of the charge, however, are hardly supported by the decision in *Hardy's Case,* and are directly in conflict with that in *Bram's.* Some of these are the following: " If such influence has been brought ·to bear on the mind of the defendant as to overcome his will and make the confession unworthy of belief it should not be believed or considered: " " The main question in regard to confessions is the same as it is in any other kind of testimony. The main question is, was the confession made under such circumstances that it may be considered true? Is it worthy of belief as a statement of facts? " In *Bram's Case* it was said: " In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment, commanding that no person ' shall be compelled in any criminal case to be a witness against himself.' " 168 U. S. 542.

The court should have instructed the jury to consider the

relations of superior and subordinate employee, of the same corporation, that had existed between the witness and the defendant for several years; the conduct of the witness in attempting to force a confession on the morning of the same day; the incarceration of the defendant in jail upon the additional charge of assault with intent to murder; the number and purposes of the visits of witness to the jail and his conversations with the defendant, in determining whether the statement of the defendant was voluntary. The jury should also have been directed to consider whether they would accept the witness' later statement of the conversation with the prisoner, as the true version, or that recorded by the stenographer as made immediately after the occurrence; and further, that any doubt in their minds whether the confession was voluntary must be determined in favor of the accused.

6. The remaining errors that have been assigned and pressed on the argument may also be considered together.

The defendant asked several instructions to the effect: That to convict as charged, the jury must believe the property was feloniously taken in the District of Columbia; that if so taken in either Georgia, South Carolina, North Carolina, or Virginia, by breaking the seal of the pouch and abstracting the package, the offense was then and there completed, and they must acquit the defendant. These were all refused and exceptions were duly reserved. In the course of the general charge, the court, after telling the jury that if they believed Hockaday's statement of the confession, they might presume the felonious taking of the package, and find the defendant guilty if they further believed he had brought the same, or $35 or more of it, into the District, proceeded as follows:

" If you find that the defendant was on the through express car when he received the pouch, and if there is no evidence that he was off the car between Atlanta and Washington; and if you further find from all the evidence, alleged admissions, and circumstances that he in some way obtained possession of such pouch, opened it and took out the pack-

age feloniously while on said run, you may infer from such facts that he brought it with him to this District in the absence of proof to the contrary."

To this an exception was also reserved.

(1) The first contention hereunder is that the courts of the District of Columbia have no jurisdiction over the offense of theft committed in a neighboring State, because the stolen property shall have been thereafter brought into said District.

This presents an interesting and important question of law that has been much debated and has resulted in a decided conflict of opinion. A similar contention was expressly denied, at an early day, by the Circuit Court of the District. *United States* v. *Tolson,* 1 Cr. C. C. 269; *United States* v. *Mason,* 2 idem, 410.

The same doctrine has been applied in Maryland (*Worthington* v. *State,* 58 Md. 403, 409), and, it seems, in a majority of the States. The principle is in the application of the legal fiction that the theft is repeated in any county or State in which any asportation of the property occurs. All the decisions, English and American, concur where the question is one of venue as between different counties of the same State. Some of the States — New Jersey, New York, North Carolina, Pennsylvania, Tennessee, and perhaps Kentucky — have refused an extension of the fiction where the original taking was in another State, holding, in such case, that the thief, in bringing the property into another State, becomes nothing more than a fugitive from justice, and liable to arrest and return as such. On the other hand, Maine and Vermont go to the extreme of punishing the theft where the removed goods have been stolen in Canada. Massachusetts, again, takes jurisdiction where the theft has occurred in another State, but has denied it when occurring in Canada. *Com.* v. *Uprichard,* 3 Gray, 434.

We will not now undertake the determination of this vexed question.

This is not an ordinary case of theft, where the felonious taking is necessarily complete in one act. This package was

intrusted to the defendant for safe carriage to, and delivery within, the District of Columbia. It must be remembered that there was no direct proof that defendant took the money, or if he took it, where the act was done. He was not seen with the package upon his person; no demand was made en route; it was not missed and hence no search was made for it. The mere intent to take the money, no matter when or where conceived, could only become an offense, in contemplation of law, when followed by the actual taking and change of the character of his possession.

If it had been proved that the defendant actually removed the package from the sealed pouch, in one of the States traversed, and took the same into his personal possession with the intent to convert the property to his own use, and so brought it into the District, the original taking would constitute a complete offense, and the jurisdiction to punish him here would then depend upon the latter act and the question, whether, in law, that would be regarded as repeating the felonious taking. It is because of this apparent inability to prove the actual taking, if there was such by the accused, at any particular place between Atlanta and Washington, that we regard the determination of the particular point as not now essential. Besides the cause is one that ought to be speedily decided, and the few days left before the adjournment of the term do not afford sufficient time for its necessary examination and careful consideration.

(2) We are of the opinion, however, that the charge given by the court, as quoted above, embodies error.

The Government made no attempt to prove anything relating to the actions of the defendant between leaving Atlanta and arriving at the station in Washington. The defendant called the only witnesses thereto. These included the railway baggage-master, who occupied the same car, and the express company's transfer agents at the four points where the combination safe had been opened. No questions were asked by either side, tending to develop what opportunities the defendant may have had to leave the train temporarily, or whether he in fact did so; nor was the defendant himself

interrogated thereon. Under these conditions, to first charge the jury that they might infer from all the facts and circumstances, including defendant's confession, that he feloniously took the package somewhere on the way, and, thereafter, that they might "infer from such facts that he brought it with him into the District, in the absence of proof to the contrary," was clearly erroneous. It authorized presumption upon presumption, inference from inference alone. "A presumption which the jury is to make is not a circumstance in proof; and it is not, therefore, a legitimate foundation for a presumption. There is no open and visible connection between the fact out of which the first presumption arises and the fact sought to be established by the dependent presumption." *United States* v. *Ross,* 92 U. S. 281, 284; *Weaver* v. *Railroad Co.,* 3 App. D. C. 436, 455.

The error was rendered more serious by the addition of the words: "in the absence of proof to the contrary". This imposed the burden of disproving or overcoming the final inference upon the defendant. To enable the jury to infer that the package, after having been stolen, had been brought into the District, it was incumbent upon the prosecution to offer additional evidence, from which the inference could be made, with the necessary certainty, that it must have been.

Any evidence, on the part of the defendant, tending to show that he had opportunities to secrete or deposit the package for safe-keeping, in any of the places through which he passed after having received it, would necessarily have tended to strengthen the circumstances from which the original felonious taking was to be inferred.

It follows that the judgment must be reversed and the cause remanded, with direction to grant a new trial.

*Reversed.*

Mr. Chief Justice ALVEY dissented.